**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| WHITE STAR PETROLEUM HOLDINGS, LLC, *et al.,*[1] | § | Case No. 19-12521-JDL |
| | § | |
| | § | Jointly Administered |
| Debtors. | § | |
| | § | |
| | § | |
| | § | |
| WHITE STAR PETROLEUM HOLDINGS, LLC LITIGATION TRUST | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adversary No. _____ |
| vs. | § | |
| | § | |
| ENLINK OKLAHOMA GAS PROCESSING, LP | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT FOR AVOIDANCE ACTIONS AND CLAIM OBJECTIONS

Plaintiff, White Star Petroleum Holdings, LLC Litigation Trust (the "**Trust**"), through its trustee Harold L. Kaplan ("**Trustee**") and his undersigned attorneys, brings the following fraudulent transfer and preference claims against Enlink Oklahoma Gas Processing, LP ("**Enlink**"). In support of these claims, the Trust alleges as follows:

---

[1] The Debtors in these chapter 11 cases, and the last four digits of their U.S. taxpayer identification numbers are: White Star Petroleum Holdings, LLC (0575) ("**WSTR Holdings**"), White Star Petroleum, LLC (0977) ("**WSTR**"), White Star Petroleum II, LLC (4347) ("**WSTR II**"), White Star Petroleum Operating, LLC (5387) ("**WSTR Operating**") and WSP Finance Corporation (9152) ("**WSP Finance**" and together with WSTR Holdings, WSTR, WSTR II and WSTR Operating, the "**Debtors**"). The Debtors' corporate headquarters is located at 301 N.W. 63rd Street, Suite 600, Oklahoma City, OK 73116.

4844-9634-6325

# I.
## JURISDICTION

1.　　This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

2.　　Venue is proper in this Court pursuant to 28 U.S.C. § 1408 because White Star Petroleum Holdings, LLC filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Western District of Oklahoma and Enlink Oklahoma Gas Processing, LP filed proofs of claim in the bankruptcy proceeding.

# II.
## NATURE OF ACTION

3.　　The statutory predicates for the relief requested herein are 11 U.S.C. §§ 101, 541, 542, 544, 547, 548, and 550 and the Uniform Fraudulent Transfer Act ("**UFTA**") § 112 *et seq.*.

# III.
## SUMMARY OF ACTION

4.　　The Trust was created by the confirmed[2] Joint Chapter 11 Plan of Liquidation of White Star Petroleum Holdings, LLC and its Debtor Affiliates (the "**Plan**") and the related Litigation Trust Agreement (the "**Trust Agreement**"). The Trust was created to empower Harold L. Kaplan, the trustee of the Trust, to investigate, prosecute, and otherwise pursue viable potential Preserved Causes of Action assigned to the Trust by debtors White Star Petroleum Holdings, LLC ("**Holdings**"), White Star Petroleum, LLC ("**White Star**"), White Star Petroleum II, LLC ("**White Star II**"), WSP Finance Corporation ("**WSP Finance**"), and White Star Petroleum Operating, LLC ("**White Star Operating**") (collectively, the "**Debtors**") for the benefit of creditors with general unsecured claims against the Debtors' estate, specifically including in Exhibit C of the Plan Supplement [Docket 1093]: "Any Claim or Cause of Action related to, or in connection with,

---

[2] *See In re White Star Petroleum Holdings, LLC, et al.,* Case No. 19-12521-JDL (Bankr. W.D. Ok.) (the "**Bankruptcy Proceeding**").

4844-9634-6325

the Debtors' amendment of its agreements with Enlink Oklahoma Gas Processing LP (" Enlink"),
including the May 19, 2018 amendment to the gas gathering and processing agreement with Enlink
and other transactions related thereto."

5.      In sum, in May 2018, while Debtors were already *in extremis*, in conjunction with
modification of certain hypothetical long-term contractual midstream obligations, Enlink extracted
from Debtors cash and equivalents exceeding $23 million and a $58 million note unconnected to
any new financing, thereby pushing Debtors further into insolvency and ultimate bankruptcy.
Among the resulting causes of action are avoidable transfers to Enlink that can be divided into the
following categories:

a.      As "projected <u>future</u> deficiency payments": (i) a $19,500,000 upfront cash
payment and (ii) a $58,000,000 secured term loan note with security
interests in assets of, and guarantees from, WSP Finance, White Star
Operating, and White Star II, transferred to Enlink pursuant to the Term
Loan Credit Agreement, dated May 9, 2018 (collectively the "**Term Loan
Credit Agreement Transfers**");

b.      An Overriding Royalty Interest Assignment valued at $3,800,000
transferred to Enlink pursuant to the Amendment to Gas Gathering and
Processing Agreement, dated May 9, 2018 ("**ORRI Assignment**");

c.      The payment of approximately $116,000 made to Enlink pursuant to the
First Amendment to the Term Loan Credit Agreement, dated November 16,
2018, equal to twenty basis points multiplied by the outstanding balance of
the loan ("**First Amendment Transfer**");

d.      The payment or reimbursement of out-of-pocket expenses incurred in
connection with the Second Amendment to the Term Loan Credit
Agreement, dated February 27, 2019 ("**Second Amendment Transfer**");
and

e.      The payments exceeding $85,000 made to Enlink for or on account of
antecedent debt on February 28, 2019, March 29, 2019, and April 30, 2019
("**Preferences**").

6.      The Term Loan Credit Agreement Transfers, ORRI Assignment, First Amendment
Transfer, and Second Amendment Transfer (collectively "**Avoidable Transfers**") are all

avoidable as either actually or constructively fraudulent under sections 544 and 548 of the Bankruptcy Code and Chapter 7 of the Oklahoma Statutes Annotated. The Preferences are avoidable under section 547 of the Bankruptcy Code because the Preferences were made within ninety days of the Petition Date[3].

## IV.
## PARTIES

7.    The Plaintiff is the White Star Petroleum Holdings, LLC Litigation Trust, as to which Harold L. Kaplan, is the trustee.

8.    Upon information and belief, Defendant Enlink is a limited partnership with its principal executive offices and principal place of business located at 1722 Routh St., Suite 1300, Dallas, TX 75201.

## V.
## FACTUAL BACKGROUND

**A.    Background of the Debtors**

9.    Debtors were Oklahoma City, Oklahoma-based independent oil and natural gas companies focused on the acquisition, development, exploration, and production of oil, natural gas, and natural gas liquids located in the Mid-Continent region of the United States.

10.    White Star II, White Star Operating, and WSP Finance are all directly and wholly-owned by White Star. White Star is directly and wholly-owned by Holdings.



---

[3] Petition Date is defined in ¶ 23.

**B.     Insolvency of the Debtors**

11.     Prior to 2016, Debtors operated with a lean capitalization structure. In 2016, oil prices plunged and companies scrambled to minimize exposure and, in some cases, sought to capitalize on distressed asset acquisition opportunities. Debtors chose the latter option, and incurred substantial debt to acquire assets and invest heavily in capital expenditures. The following year, in 2017, Debtors doubled down on their asset acquisition strategy and incurred more debt to purchase Lighthouse Oil & Gas, LP at a grossly overvalued price.

12.     The series of asset acquisitions in 2016 and the Lighthouse Oil & Gas, LP acquisition in 2017 catapulted Debtors further into insolvency and left Debtors operating in the red until Debtors' filings for bankruptcy in May 2019. Said transactions further depleted Debtors' working capital and left Debtors increasingly over-leveraged, undercapitalized, insolvent, and illiquid.[4]

13.     Debtors' insolvency in 2017[5] escalated in 2018 when its accounts receivable turnover rate slowed significantly[6] and, already undercapitalized and illiquid, Debtors struggled to pay their invoices, which caused their accounts payable to skyrocket.[7] In Debtors' December 31, 2018 audited financials, Debtors report:

> "Included in accounts payable at December 31, 2018 and 2017 are book overdrafts of approximately $13.9 million and $12.3 million, respectively, representing the amount by which checks issued but not presented to our bank for collection exceeded balances in applicable bank accounts."

---

[4] The "lucrative" asset acquisition opportunities Debtors pursued proved to be substantively hollow, and in 2018, Debtors reported $460,445,000 of property impairments ***and no gain on asset dispositions.***

[5] As reported in White Star Petroleum, LLC's Audited Consolidated Financial Statements, Debtors' current liabilities exceeded Debtors' current assets by 290%.

[6] As reported in White Star Petroleum, LLC's Audited Consolidated Financial Statements, Debtors' revenues increased 130% from 2017 to 2018 but accounts receivable increased 224%.

[7] As reported in White Star Petroleum, LLC's Audited Consolidated Financial Statements, Debtors' accounts payable increased from $49,204,000 to $75,564,000 from 2017 to 2018.

4844-9634-6325

14.     Similarly, the Management Discussion and Analysis of the December 31, 2018 audited financial statements reports significant impairments:

> "For the fiscal year ended December 31, 2018, White Star recorded impairments of $388 million associated with proved properties, which are presented in property impairments in the consolidated statements of operations. Impairment was recorded primarily due to inability to fund proved undeveloped properties and decline in commodity prices."

15.     In 2018, Debtors' dire financial condition became apparent. Debtors reported a $467,325,000 operational loss, a $484,516,000 net loss, and a deficit of equity of $121,360,000. Debtors' current liabilities far exceeded Debtors' current assets[8], and the Debtors began and ended 2018 with ***no cash or cash equivalents***. Desperate for cash, Debtors sold assets outside of the ordinary course of business to try to pay their debts as they came due - all the while punting and renegotiating their debt obligations. The Independent Auditor's Report for the Fiscal Year Ending December 31, 2018 reported a bleak outlook for the Debtors:

> As discussed in Note 1 to the financial statements, the Company did not expect to remain in compliance with all of its financial and indebtedness covenants over the next 12 months, which would trigger an event of default to occur under its Revolving Credit Facility and its Term Loan, potentially accelerating repayment of those loans. **Management has stated that substantial doubt exists about the Company's ability to continue as a going concern**.

16.     The Management Discussion and Analysis section of the December 31, 2018 audited financials corroborates the Independent Auditor's Report:

> Ability to Continue as a Going Concern
>
> Based on our projections at year-end 2018, we did not expect to remain in compliance with all our financial and indebtedness covenants over the next 12 months and expected to have little or no availability on our Revolving Credit Facility during periods starting in 2019. Falling out of compliance with our covenants would trigger an event of default to occur under our Revolving Credit Facility and our Term Loan, which would allow the banking syndicate of our

---

[8] As reported in White Star Petroleum, LLC's Audited Consolidated Financial Statements, Debtors' current assets totaled $63,446,000 and Debtors' current liabilities totaled $430,193,000.

Revolving Credit Facility and/or the Term Loan lender of our Term Loan (after complying with a standstill period) to accelerate repayment of their respective loans. **The uncertainty associated with our ability to repay debt if it were to prematurely come due and maintain adequate liquidity to repay our current liabilities as they come due raised substantial doubt about our ability to continue as a going concern as of year-end 2018.**

We were actively exploring potential recapitalization options at year-end to increase our liquidity and obtain a more favorable covenant package and expected to execute a transaction in the first quarter of 2019; however, those efforts were ultimately unsuccessful.

17.     In 2018, Debtors' institutional lenders acknowledged Debtors' abysmal financial condition and impending financial doom and sought to minimize their exposure to Debtors' inevitable default by aggressively cutting back Debtors' line of credit and overall access to capital, and requiring Debtors to pay down the difference between Debtors' outstanding balance and the new maximum credit balance. Faced with large borrowing base deficiency payments, $210,618,000 of matured long term debt, and little to no access to new capital from institutional lenders, Debtors desperately sought to circumvent –or delay –covenant defaults and bankruptcy by restructuring future trade creditor debt.

## C.     The Enlink Transfers

18.     Under the Gas Gathering and Processing Agreement between Enlink and White Star ("**GGPA**") dated June 21, 2014, White Star appeared destined to incur future obligations for minimum volume commitment payments[9]. On May 9, 2018, with White Star's bankruptcy on the horizon, Enlink agreed to an Amended Gas Gathering Agreement waiving future contingent minimum volume commitments on an immediate accelerated basis: (i) an upfront $19,500,000 cash payment under the Term Loan Credit Agreement, (ii) a $58,000,000 secured note under the

---

[9] Under GAAP Statement of Financial Accounting Standards No.5, a company must report probable contingent liabilities on its balance sheet.

Term Loan Credit Agreement, (iii) an overriding royalty interest valued at $3,800,000, (iv) security interests in assets of WSP Finance, White Star Operating, and White Star II, and (v) guarantees from WSP Finance, White Star Operating, and White Star II –entities that were not previously obligated under the GGPA.

19.    The restructuring package with Enlink may have temporarily staved off bankruptcy for White Star, but launched the Debtors into a substantially worse liquidity and financial position. The Amended Gas Gathering Agreement locked up key White Star assets, depleted White Star's cash reserve, and worsened White Star's balance sheet by adding $58,000,000 as a non-contingent debt obligation instead of keeping in a footnote the possibility of contingent *future* debt obligations cognizable over the span of ten to twenty years.

20.    The Debtors failed to make their first installment payment under the Term Loan Credit Agreement, and, in exchange for postponed installment payment deadlines, Enlink extracted an additional upfront approximately $116,000 cash payment from Debtors pursuant to the First Amendment to the Term Loan Credit Agreement, dated November 16, 2018, equal to 20 basis points multiplied by the balance of the outstanding loan. Debtors again failed to make the first installment payment under the First Amendment to the Term Loan Credit Agreement, and on February 27, 2019, Debtors and Enlink executed the Second Amendment to the Term Loan Credit Agreement whereby Debtors agreed to reimburse or pay Enlink for out-of-pocket expenses incurred in connection with the Second Amendment to the Term Loan Credit Agreement.

21.    Within ninety days of the Debtors' bankruptcy filing, Debtors made payments of $32,081.89, $29,319.74, and $24,773.85 to Enlink on/account of antecedent debt on February 28, 2019, March 29, 2019, and April 30, 2019, respectively.

**D.      The Bankruptcy Proceedings**

22.      On May 24, 2019, creditors of White Star commenced an involuntary bankruptcy proceeding for White Star under Chapter 11 of the Bankruptcy Code by filing petitions for relief in the U.S. Bankruptcy Court for the Western District of Oklahoma.

23.      On May 28, 2019, Debtors commenced voluntary proceedings under Chapter 11 of the Bankruptcy Code by filing petitions for relief in the U.S. Bankruptcy Court for the District of Delaware ("**Petition Date**")[10].

24.      On June 20, 2019, the presiding judge for the Delaware proceeding entered an order transferring the proceeding to the U.S. Bankruptcy Court for the Western District of Oklahoma (the "**Bankruptcy Court**"). The Bankruptcy Court opened a new voluntary proceeding under Chapter 11 of the Bankruptcy Code, which was then consolidated with the Bankruptcy Proceeding, where Debtors' cases proceeded thereafter.

25.      In the Bankruptcy Proceeding, the April 16, 2020 Bankruptcy Court order confirming the Plan and approving the Litigation Trust Agreement created the Plaintiff litigation trust.

26.      The Plan became effective on April 28, 2020, and all of the rights, title, and interests in various causes of actions vested with the Litigation Trust as of that date, including all causes of action to avoid and recover a transfer of property or an obligation incurred by any of the Debtors pursuant to sections 544, 547, 548, and 550 of the Bankruptcy Code or similar state law, and any claim or cause of action related to, or in connection with, the Debtors' amendment of its agreements with Enlink.

---

[10] For White Star Petroleum, LLC only, "Petition Date" is defined as May 24, 2019.

4844-9634-6325

27.     The Plan and Trust Agreement empower the Trustee to investigate and prosecute such claims, and entitle the Trustee to access Debtors' books and records in pursuit and investigation of these claims.

28.     The Plan and Trust Agreement empower the Trustee to investigate and prosecute such claims, and entitle the Trustee to access Debtors' books and records in pursuit and investigation of these claims.

29.     The factual allegations below are based on such review of the Debtors' books and records to-date.

## VI.
## CLAIMS FOR RELIEF

A.      **CLAIM FOR RELIEF I:** **Avoidance of the Term Loan Credit Agreement Transfers, ORRI Assignment, First Amendment Transfer, and Second Amendment Transfer as Actually Fraudulent (UFTA § 116(A)(1) and/or § 544(b) of the Bankruptcy Code).**

30.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

31.     The ORRI Assignment, the First Amendment Transfer, the Second Amendment Transfer, and each of the Term Loan Credit Agreement Transfers (individually "**Fraudulent Transfer**" and collectively "**Fraudulent Transfers**") to Enlink constitutes a "transfer" pursuant to UFTA § 113(12) to or for the benefit of Enlink made in the four-year period prior to the Petition Date. The money, asset(s), and/or interest in asset(s) which are the subject of each Fraudulent Transfer constituted property of Debtors.

32.     Debtors had at least one creditor when each Fraudulent Transfer was made who could have avoided each Fraudulent Transfer under non-bankruptcy law, including UFTA. These creditors include, but are not limited to:

      a.      *Baker Hughes (claim no. 1034), who has been a creditor since at least December of 2018;*

b.      *Halliburton (claims no. 3906, 3908), who has been a creditor since at least January of 2019;*

c.      *Red-D-Arc Inc. (claim no. 2), who has been a creditor since at least August of 2018;*

d.      *Internal Revenue Service (claims no. 9, 85), who has been a creditor since at least February of 2017;*

e.      *DCP Operating Company, LP (claim no. 75), who has been a creditor since at least May of 2016;*

f.      *Dan Shupe (claim no. 86), who has been a creditor since at least 2017;*

g.      *Simmons Machine Works, Inc. (claim no. 346), who has been a creditor since at least January of 2012;*

h.      *Western Workstrings, LLC (claim no. 350), who has been a creditor since at least March of 2017;*

i.      *Pyramid Tubular Products LLC (claim no. 484), who has been a creditor since at least February of 2018;*

j.      *Kwick Rentals, LLC (claim no. 516), who has been a creditor since at least November of 2016.*

33.      Each of the Fraudulent Transfers was made with the actual intent to hinder, delay, or defraud the Debtors' creditors. The transfers to Enlink were made for little or no consideration, shortly after a substantial debt was incurred, and when Debtors were insolvent, undercapitalized, and unable to pay their debts as they became due. Moreover, Enlink was also aware of Debtors' vulnerable financial condition at the time of the Fraudulent Transfers because section 11.6 of the GGPA provided each party with access to the other party's books and records.

34.      Therefore, the Fraudulent Transfers are avoidable pursuant to UFTA §§ 116(A)(1) and 116(B), and the Trustee is entitled to judgment avoiding the Fraudulent Transfers and any such other and further relief to which he may be entitled.

B.    **CLAIM FOR RELIEF II:** **Avoidance of the Term Loan Credit Agreement Transfers, ORRI Assignment, First Amendment Transfer, and Second Amendment Transfer as Actually Fraudulent (§ 548(a)(1)(A) of the Bankruptcy Code).**

35.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

36.    Each Fraudulent Transfer to Enlink constitutes a "transfer" pursuant to 11 U.S.C. § 101(54) that was made in the two-year period prior to the Petition Date, and the money, asset(s), and/or interest in asset(s) which are the subject of each Fraudulent Transfer constituted property of Debtors.

37.    Debtors made each Fraudulent Transfer with actual intent to hinder, delay, and/or defraud Debtors' existing and future creditors because Debtors knew the Fraudulent Transfers would undermine and jeopardize their ability to pay existing and future debts owed to creditors. Based on the Debtors' own financial statements, at the time of the Fraudulent Transfers, Debtors were saddled with $210,618,000 of debt that would come due in 2018, and Debtors had *no cash or cash equivalents* and *no viable prospects for acquiring additional capital to pay the debt*. Yet, with full knowledge that the Debtors were headed into a series of payment and covenant defaults which would land Debtors in bankruptcy, Debtors chose to gift Enlink with cash payments exceeding $19,000,000 and other assets in exchange for lower future minimum loan volume commitment payments that *may have never come due.*

38.    Debtors decided to proceed with the Fraudulent Transfers despite their knowledge that the Fraudulent Transfers would: (1) hinder creditors' recoveries because the assets which were the subject of the Fraudulent Transfers made to Enlink would otherwise be used to satisfy other creditors' debts which were, or would soon become, actually and immediately due; (2) delay creditors because creditors who would have otherwise obtained immediate satisfaction of their debt were required to wait until the resolution of the bankruptcy process to receive any recovery;

and (3) effectively defraud creditors because Debtors shifted resources that would ordinarily be used to satisfy immediate debts to pay off a future debt that would possibly never come due.

39.    Therefore, the Fraudulent Transfers are avoidable pursuant to § 548(a)(1)(A) of the Bankruptcy Code, and the Trustee is entitled to judgment avoiding the Fraudulent Transfers and any such other and further relief to which he may be entitled.

C.    **CLAIM FOR RELIEF III**: Avoidance of the Term Loan Credit Agreement Transfers, ORRI Assignment, First Amendment Transfer, and Second Amendment Transfer as Constructively Fraudulent (UFTA §§ 116(A)(2) and/or 117 and/or § 544(b) of the Bankruptcy Code).

40.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

41.    Each of the Fraudulent Transfers to Enlink constitutes a "transfer" pursuant to UFTA § 113(12) to or for the benefit of Enlink made in the four-year period prior to the Petition Date. The money, asset(s), and/or interest in asset(s) which are the subject of each Fraudulent Transfer constituted property of Debtors.

42.    Debtors had at least one creditor when each Fraudulent Transfer was made who could have avoided each Fraudulent Transfer under non-bankruptcy law, including UFTA.

43.    Each of the Fraudulent Transfers was made without Debtors receiving reasonably equivalent value in exchange for the transfers because the Fraudulent Transfers were made for minimal or no consideration. Therefore, the Fraudulent Transfers are avoidable pursuant to UFTA §§ 116(A)(2) and 117, and the Trustee is entitled to judgment avoiding the Fraudulent Transfers and awarding the Trustee such other and further relief to which he may be entitled.

D.    **CLAIM FOR RELIEF IV**: Avoidance of the Term Loan Credit Agreement Transfers, ORRI Assignment, First Amendment Transfer, and Second Amendment Transfer as Constructively Fraudulent (§ 548(a)(1)(B) of the Bankruptcy Code).

44.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

**PAGE 13**

45.     Each Fraudulent Transfer to Enlink constitutes a "transfer" pursuant to 11 U.S.C. § 101(54) that was made in the two-year period prior to the Petition Date, and the money, asset(s), and/or interest in asset(s) which are the subject of each Fraudulent Transfer constituted property of Debtors.

46.     Each of the Fraudulent Transfers was made without Debtors receiving reasonably equivalent value in exchange for the transfers because the Fraudulent Transfers were made to Enlink for minimal or no consideration.

47.     Debtors made each Fraudulent Transfer when the Debtors were technically and commercially insolvent, or, alternatively, Debtors became insolvent on or after the date the Fraudulent Transfers were made. Debtors were engaged in a business or a transaction for which Debtors' had unreasonably small capital and Debtors intended to incur, and believed it would incur, debts that would be beyond the Debtors' ability to pay as such debts matured because Debtors were saddled with $210,618,000 of debt that would come due in 2018, and Debtors had *no cash or cash equivalents* and *no viable prospects for acquiring additional capital to pay the debt*.

48.     Therefore, the Fraudulent Transfers are avoidable pursuant to § 548(a)(1)(B) of the Bankruptcy Code, and the Trustee is entitled to judgment avoiding the Fraudulent Transfers and such other and further relief to which he may be entitled.

**E.     CLAIM FOR RELIEF V: Avoidance of the Preferences (§ 547 of the Bankruptcy Code).**

49.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

50.     Debtors paid Enlink $32,081.89, $29,319.74, and $24,773.85 for or on account of an antecedent debt on February 28, 2019, March 29, 2019, and April 30, 2019, respectively.

51. Debtors made the payments to Enlink for Enlink's benefit within 90 days before the Petition Date and while the Debtors were insolvent.

52. Therefore, the Preferences are avoidable under section 547 of the Bankruptcy Code and the Trustee is entitled to judgment avoiding the Preferences.

## VII.
## RECOVERY OF AVOIDED TRANSFERS

A. **CLAIM FOR RELIEF VI: Recovery and Preservation of Transfers (11 U.S.C. §§ 550 and 551).**

53. The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

54. The Trustee is entitled to avoid all Fraudulent Transfers pursuant to UFTA and §§ 544(b) and 548 of the Bankruptcy Code.

55. Enlink was either the initial transferees of the Fraudulent Transfer(s) or the immediate or mediate transferees of the Fraudulent Transfer(s).

56. Pursuant to § 550(a) of the Bankruptcy Code, the Plan, and the Trust Agreement, the Trustee, in his representative capacity, is entitled to recover from Enlink the Fraudulent Transfers (or the value thereof), plus interest thereon to the date of payment and the costs of this action.

57. Pursuant to § 551 of the Bankruptcy Code, all of the Fraudulent Transfer(s) are preserved for the benefit of the Debtors' bankruptcy estates.

## VIII.
## CLAIM OBJECTION

A. **CLAIM FOR RELIEF VII: Objection to and Disallowance of all Claims (11 U.S.C. § 502(d) and (j))**

58. The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

59. Enlink is an initial, immediate and/or mediate transferee of the Avoidable Transfers, which property is recoverable and preserved under sections 550 and 551 of the

4844-9634-6325

Bankruptcy Code.

60.    Enlink has not paid the amount of the Avoidable Transfers, or turned over such property, for which Enlink is liable under 11 U.S.C. § 550.

61.    Pursuant to 11 U.S.C. § 502(d), any and all claims of Enlink and/or its assignee, against the Debtors must be disallowed until such time as Enlink pays to the Debtors an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

62.    Pursuant to 11 U.S.C. § 502(j), any and all claims of Enlink and/or its assignees against the Debtors' bankruptcy estates previously allowed must be reconsidered and disallowed until such time as Enlink pays to the Debtors an amount equal to the aggregate amount of the Avoidable Transfers.

## IX.
## REQUEST FOR ATTORNEYS' FEES AND EXPENSES

63.    The Trustee and the Committee have incurred attorneys' fees and expenses in their investigation of these causes of action.

64.    The Trustee therefore requests reimbursement of all attorneys' fees and expenses for the investigation and prosecution of this matter.

## X.
## REQUEST FOR RELIEF

WHEREFORE, the Trustee requests relief and judgment:

a.    Avoiding the Fraudulent Transfers and directing the Fraudulent Transfers be set aside;

b.    Awarding the Trustee the value of the property transferred under each Fraudulent Transfer;

c.    Avoiding the Preferences and awarding the Trustee the value of each Preference;

d.    Awarding attorneys' fees and costs incurred by the Trustee in investigating and prosecuting this Complaint and the attendant causes of actions; and

**PAGE 16**

e.    Awarding such other and further relief, either at law or in equity, general or special, to which the Trustee may be justly entitled.

Dated: May 18, 2021
Houston, Texas

                            Respectfully submitted,

                            **FOLEY & LARDNER, LLP**

                            */s/ Mike Seely*
                            Mike Seely
                            State Bar No. 34079
                            Email: mseely@foley.com

                            and

                            Ronald L. Oran, Jr. (*pro hac vice pending*)
                            State Bar No. 24072268
                            Email: roran@foley.com
                            Geoffrey H. Bracken (*pro hac vice pending*)
                            State Bar No. 02809750
                            Email: gbracken@foley.com
                            Jennifer N. Huckleberry (*pro hac vice pending*)
                            State Bar No. 24118414
                            Email: jhuckleberry@foley.com
                            1000 Louisiana Street, Suite 2000
                            Houston, TX 77002
                            Telephone: 713.276.5500
                            Facsimile: 713-276-5555

                            **ATTORNEYS FOR WHITE STAR**
                            **PETROLEUM HOLDINGS, LLC**
                            **LITIGATION TRUST**

4844-9634-6325